United States Court of Appeals,

Eleventh Circuit.

No. 94-9121.

Aurelia DAVIS, as Next Friend of LaShonda D., Plaintiff-Appellant,

v.

MONROE COUNTY BOARD OF EDUCATION, et al., Defendants-Appellees.

Aug. 21, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 94-CV-140-4MAC(WDO), Wilbur D. Owens, Jr., Judge.

Before HATCHETT, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges[*], and KRAVITCH[**] and HENDERSON, Senior Circuit Judges.

TJOFLAT, Circuit Judge:

Appellant, Aurelia Davis, brought this suit against the Board of Education of Monroe County, Georgia, (the "Board") and two school officials, Charles Dumas and Bill Querry, on behalf of her daughter, LaShonda Davis. The complaint alleged that the defendants violated Section 901 of the Education Amendments of 1972, Pub.L. No. 92-318, 86 Stat. 235, 373 (1972) (codified as amended at 20 U.S.C. § 1681 (1994)) ("Title IX"), and 42 U.S.C. § 1983[1] by failing to prevent a student at Hubbard Elementary School ("Hubbard") from sexually harassing LaShonda while she was a student there. Appellant separately alleged that the defendants discriminated against

---

[*]Judge R. Lanier Anderson recused himself and did not participate in this decision.

[**]Senior Judge Phyllis A. Kravitch, who was a member of the en banc court which heard oral argument in this case, took senior status on January 1, 1997, and has elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

[1]This section provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." 42 U.S.C. § 1983 (1994).

LaShonda on the basis of race in violation of 42 U.S.C. § 1981.[2] Appellant sought injunctive relief and $500,000 in compensatory and punitive damages.

The district court dismissed appellant's complaint in its entirety for failure to state a claim upon which relief can be granted. *See Aurelia D. v. Monroe County Bd. of Educ.,* 862 F.Supp. 363, 368 (M.D.Ga.1994); *see also* Fed.R.Civ.P. 12(b)(6). Appellant appealed the district court's dismissal of her Title IX claim against the Board,[3] arguing that a school board can be held liable under Title IX for its failure to prevent sexual harassment among students. On appeal, a divided three-judge panel reinstated her Title IX claim against the Board. *See Davis v. Monroe County Bd.*

---

[2]Davis actually alleged that the named defendants discriminated on the basis of race in violation of "the Education Act of 1972 and the Civil Rights Act of 1991." Davis was apparently referring to the Education Amendments of 1972, Pub.L. No. 92-318, 86 Stat. 235 (1972), and the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071 (1991). The former act, however, does not address racial discrimination in education, and the latter act does not provide a cause of action for racial discrimination in education. The district court construed this portion of the complaint to allege a violation of 42 U.S.C. § 1981, which does provide a cause of action against certain types of racial discrimination.

[3]Davis did not appeal the district court's dismissal of her Title IX claim with regard to individual defendants Dumas and Querry. Davis similarly did not appeal the district court's dismissal of her § 1981 claim. Therefore, we do not consider these claims.

With regard to Davis' § 1983 claim, the complaint seemed to allege that the defendants were liable under this provision solely because they violated Title IX. Davis, however, apparently argued before the district court that the defendants were liable under § 1983 for infringing LaShonda's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The district court dismissed this implied claim under Rule 12(b)(6). *See Aurelia D.,* 862 F.Supp. at 366.

Davis did not appeal the dismissal of her § 1983 claim to the extent it was based on the defendants' alleged violation of Title IX. Accordingly, that claim is not before us. She did, however, appeal the dismissal of her § 1983 claim to the extent it was based on the defendants' alleged violation of the Due Process Clause. In addition, Davis argued for the first time before the three-judge panel that the same § 1983 claim encompassed a violation of the Equal Protection Clause of the Fourteenth Amendment.

The panel rejected Davis' due-process and equal-protection arguments and affirmed the dismissal of her steadily expanding § 1983 claim under 11th Cir. R. 36-1. *See Davis v. Monroe County Bd. of Educ.,* 74 F.3d 1186, 1188 (1996). Davis did not petition the court to rehear this ruling en banc, and we see no reason to disturb the panel's decision *sua sponte.* We therefore do not consider Davis' various § 1983 claims. In sum, we address only Davis' Title IX claim against the Board.

*of Educ.,* 74 F.3d 1186, 1195 (11th Cir.1996).  At the Board's request, we granted rehearing en banc to consider appellant's Title IX claim,[4] and we now affirm the district court's dismissal of this claim.

I.

A.

We review *de novo* the district court's dismissal of appellant's complaint for failure to state a claim upon which relief can be granted.  *See McKusick v. City of Melbourne,* 96 F.3d 478, 482 (11th Cir.1996).  To this end, we take as true the allegations appellant has set forth in her complaint and examine whether those allegations describe an injury for which the law provides relief.  *See Welch v. Laney,* 57 F.3d 1004, 1008 (11th Cir.1995).  We construe appellant's allegations liberally because the issue is not whether appellant will ultimately prevail but whether she is entitled to offer evidence to support her claims.  *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).  We begin by describing the allegations contained in appellant's complaint.

B.

LaShonda Davis was enrolled as a fifth-grade student at Hubbard during the 1992-1993 school year.  During that school year, Bill Querry was the principal of Hubbard, and Diane Fort, Joyce Pippin, and Whit Maples were teachers at the school.  The complaint alleges that the Board administered federally funded educational programs at Hubbard and supervised the school's employees, including Principal Querry and Teachers Fort, Pippin, and Maples.

According to the complaint, a fifth-grade student named "G.F." was in several of LaShonda's classes and initially was assigned to the seat next to LaShonda in Fort's classroom.  On December 17, 1992, while in Fort's classroom, G.F. allegedly tried to touch LaShonda's breasts and vaginal area.  G.F. also allegedly directed vulgarities at LaShonda, such as "I want to get in bed with you" and "I want to feel your boobs."  LaShonda complained to Fort. After school that day, LaShonda also told her mother, the appellant, about G.F.'s behavior.  The complaint states that G.F. engaged

---

[4]*See Davis v. Monroe County Bd. of Educ.,* 91 F.3d 1418 (11th Cir.1996).  Granting rehearing en banc vacated the panel opinion by operation of law. 11th Cir. R. 35-11.

in similar (although unspecified) conduct on or about January 4, 1993,[5] and again on January 20, 1993. LaShonda allegedly reported both incidents to Fort and to appellant. After one of these first three incidents, appellant called Fort, who told appellant in the course of their conversation that Principal Querry knew about one of the incidents.

G.F.'s misconduct continued. On February 3, 1993, G.F. allegedly placed a door-stop in his pants and behaved in a sexually suggestive manner toward LaShonda during their physical education class. LaShonda reported this incident to Maples, who was the physical education teacher. On February 10, 1993, G.F. engaged in unspecified conduct similar to that of the December 17 incident in the classroom of Pippin, another of LaShonda's teachers. LaShonda notified Pippin of G.F.'s behavior and later told appellant, who then called Pippin to discuss the incident. On March 1, 1993, G.F. directed more unspecified, offensive conduct toward LaShonda during physical education class. LaShonda reported G.F. to Maples and Pippin. An unidentified teacher allegedly told LaShonda that Principal Querry was not ready to listen to her complaint about G.F.

At some point around March 17, 1993, Fort allowed LaShonda to change assigned seats away from G.F. G.F., however, persisted in his unwelcome attentions. On April 12, 1993, he rubbed his body against LaShonda in a manner she considered sexually suggestive; this incident occurred in the hallway on the way to lunch. LaShonda again complained to Fort.

Lastly, on May 19, 1993, LaShonda complained to appellant after school about more unspecified behavior by G.F. Appellant and LaShonda then paid a visit to Principal Querry to discuss G.F.'s conduct. At this meeting, Querry asked LaShonda why no other students had complained about G.F. During this meeting, Querry also told appellant, "I guess I'll have to threaten [G.F.] a little bit harder." On the same day, May 19, G.F. was charged with sexual battery, a charge which he apparently did not deny. The complaint does not tell us who summoned the police.

---

[5]The complaint actually alleges that this second instance of harassment occurred "on or about January 2, 1993." We note that January 2, 1993 was a Saturday. Presumably, there was no school on Saturday, so G.F. could not have sexually harassed LaShonda at Hubbard on that day. Friday, January 1, 1993, was a holiday. Accordingly, we assume for appellant's benefit that the alleged harassment occurred on or about January 4, 1993.

In all, the complaint describes eight separate instances of sexual harassment by G.F. These eight instances of alleged harassment occurred, on average, once every twenty-two days over a six-month period. Three instances occurred in Fort's classroom; two occurred in Maples' physical education class; one occurred in Pippin's classroom; one occurred in a school hallway; and one occurred in an unspecified location. LaShonda reported four instances of alleged harassment to Fort, two to Maples, and two to Pippin. LaShonda reported the final instance of harassment, the May 19 incident, to appellant and Querry. The complaint does not allege that any faculty member knew of more than four instances of harassment, and the complaint indicates that Principal Querry learned of only one instance of harassment before his meeting with appellant and LaShonda on May 19.

The complaint does not state what action each of the teachers took upon being informed by LaShonda of G.F.'s demeaning conduct. We assume for appellant's benefit that the teachers took no action other than Fort's apparent notification of Principal Querry after one of the first three instances of alleged harassment and Fort's decision around March 17, 1993, to move LaShonda's assigned seat away from that of G.F. We will also accept as true that Principal Querry took no measures against G.F. other than threatening him with disciplinary action at some point before his May 19 meeting with appellant and her daughter. For example, we assume for appellant's benefit that someone other than the school staff instigated the prosecution of G.F.

Appellant claims that LaShonda suffered mental anguish because of G.F.'s behavior. As indicia of this emotional trauma, the complaint states that LaShonda's grades dropped during the 1992-1993 school year and that LaShonda wrote a suicide note in April 1993. Based on the above allegations, appellant contends that "[t]he deliberate indifference by Defendants to the unwelcomed [sic] sexual advances of a student upon LaShonda created an intimidating, hostile, offensive and abuse [sic] school environment in violation of Title IX." We therefore consider whether Title IX allows a claim against a school board based on a school official's failure to remedy a known hostile

5

environment[6] caused by the sexual harassment of one student by another ("student-student sexual harassment").

## II.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (1994). Although nothing in the plain language of Title IX speaks to the issue of student-student sexual harassment, several district courts have held that Title IX allows a student to sue a school board for failing to prevent hostile-environment sexual harassment by another student. *See Doe v. Londonderry Sch. Dist.,* No. 95-469-JD, http://lw.bna.com/ # 0708, --- F.Supp. ---- (D. N.H. June 13, 1997); *Nicole M. v. Martinez Unified Sch. Dist.,* 964 F.Supp. 1369, 1337-78 (N.D.Cal.); *Collier v. William Penn Sch. Dist.,* 956 F.Supp. 1209, 1213—14 (E.D.Pa.1997); *Bruneau By and Through Schofield v. South Kortright Cent. Sch. Dist.,* 935 F.Supp. 162, 172 (N.D.N.Y.1996); *Doe v. Petaluma City Sch. Dist.,* 830 F.Supp. 1560, 1576 (N.D.Cal.1993), *rev'd on other grounds,* 54 F.3d 1447 (9th Cir.1995); *Burrow v. Postville Community Sch. Dist.,* 929 F.Supp. 1193, 1205 (N.D.Iowa 1996); *Wright v. Mason City Community Sch. Dist.,* 940 F.Supp. 1412, 1419-20 (N.D.Iowa 1996); *Bosley v. Kearney R-1 Sch. Dist.,* 904 F.Supp. 1006, 1023 (W.D.Mo.1995); *Oona R.-S. v. Santa Rosa City Schs.,* 890 F.Supp. 1452, 1469 (N.D.Cal.1995); *Patricia H. v. Berkeley Unified Sch. Dist.,* 830 F.Supp. 1288, 1293 (N.D.Cal.1993). *But see Garza v. Galena Park Indep. Sch. Dist.,* 914

---

[6]The term "hostile environment" sexual harassment originated in employment litigation under § 703 of the Civil Rights Act of 1964, Pub.L. No. 88-352, 78 Stat. 241, 255 (1964) (codified at 42 U.S.C. § 2000e-2 (1994)) ("Title VII"). Hostile-environment sexual harassment occurs whenever an employee's speech or conduct creates an atmosphere that is sufficiently severe or pervasive to alter another employee's working conditions. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993). As discussed *infra,* n.13, we conclude that Title VII standards of liability, borrowed from the employment context, do not control our resolution of this case. Nevertheless, for purposes of our discussion of appellant's claim, we construe the complaint to allege that G.F.'s speech or conduct created an atmosphere that was sufficiently hostile or abusive to alter the conditions of LaShonda's learning environment.

6

F.Supp. 1437, 1438 (S.D.Tex.1994) ("[A] student cannot bring a hostile environment claim under Title IX.").

The courts of appeals, however, have been less enthusiastic. The Fifth Circuit has held that no cause of action exists where a school board merely knew or should have known of peer sexual harassment and failed to act. *See Rowinsky v. Bryan Ind. Sch. Dist.,* 80 F.3d 1006, 1016 (5th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996). Other circuits have resolved complaints of student-student sexual harassment without deciding whether a cause of action exists under Title IX for this alleged harm. *See, e.g., Seamons v. Snow,* 84 F.3d 1226, 1232—33 (10th Cir.1996) (holding that the plaintiff failed to state a valid claim for student-student sexual harassment because he failed to allege that the harassment in question was on account of his sex); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 250 (2nd Cir.1995) (holding that, even if Title IX created a private cause of action for sexual harassment by a non-employee of the school, plaintiff failed to allege that school officials knew or should have known of the harassment); *Doe v. Petaluma City Sch. Dist.,* 54 F.3d 1447, 1452 (9th Cir.1994) (holding that a defendant school counselor was entitled to qualified immunity against a claim that he failed to respond to known sexual harassment of the plaintiff by other students).

The Supreme Court has not squarely addressed the issue of student-student sexual harassment. In general, the Court has allowed private plaintiffs to proceed under Title IX only in cases that allege intentional gender discrimination by the administrators of educational institutions. According to the Court, plaintiffs can state a claim under Title IX by alleging that a federally funded educational institution, acting through its employees, intentionally subjected them to discrimination in its educational programs or activities. *See Cannon v. University of Chicago,* 441 U.S. 677, 709, 99 S.Ct. 1946, 1964, 60 L.Ed.2d 560 (1979). For example, where a teacher engaged a student in sexually oriented conversations, solicited dates from her, forcibly kissed her on the mouth, and thrice removed her from another class in order to engage in coercive sexual intercourse with her in a private office at the school, the Court found that the school board could be held liable for his actions.

7

*See Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 63-64, 76, 112 S.Ct. 1028, 1031, 1038, 117 L.Ed.2d 208 (1992).

Neither the Supreme Court nor this court has ever found, however, that a school board can be held liable for failing to prevent *non-employees* from discriminating against students on the basis of sex. Appellant does not allege that any employee of the Board intentionally discriminated against LaShonda by personally participating in G.F.'s offensive conduct toward her. Rather, appellant alleges that the Board violated Title IX by failing adequately to respond to LaShonda's complaints. Neither the Supreme Court nor this court has considered whether a Title IX plaintiff can proceed under this theory. In short, by seeking direct liability of the Board for the wrongdoing of a student, appellant argues for an extension of liability under Title IX. We examine the legislative history of Title IX to determine whether Congress intended this provision to reach appellant's allegations.

A.

The provision now known as Title IX emerged from a flurry of bills regarding public education. In June and July 1970, the House Subcommittee on Education of the House Committee on Education and Labor, under the leadership of Representative Edith Green, held hearings on gender discrimination in federally funded educational programs. *See Discrimination Against Women: Hearings on Section 805 of H.R. 16098 Before the Special Subcomm. on Education of the House Comm. on Education and Labor,* 91st Cong., 2d Sess. (1970) [hereinafter *House Hearings* ]. None of the testimony before Representative Green's subcommittee concerned student-student sexual harassment or related issues, such as school discipline. Instead, the subcommittee's work focused on eliminating gender discrimination in school admissions and in the employment decisions of school administrators.

By 1970, section 703 of the Civil Rights Act of 1964 already prohibited gender discrimination in employment. *See* Civil Rights Act of 1964, Pub.L. No. 88-352, § 703, 78 Stat.

8

241, 255 (1964) (codified at 42 U.S.C. § 2000e-2 (1994)) ("Title VII").[7]  Title VII, however, did not apply to educational institutions.  *See* § 702, 78 Stat. at 255 (codified as amended at 42 U.S.C. § 2000e-1 (1994)).  Similarly, section 601 of the Civil Rights Act prohibited racial discrimination by all recipients of federal funding.  *See* § 601, 78 Stat. at 252 (codified at 42 U.S.C. § 2000d (1994)) ("Title VI").[8]  Title VI did not ban gender discrimination by recipients of federal funding.

To fill this gap in antidiscrimination legislation, the subcommittee drafted a proposed amendment to H.R. 16098, 91st Cong. (1970).  This amendment would have applied to schools the non-discrimination requirements of Title VII and added "sex" to the types of discrimination banned by Title VI. *See House Hearings, supra,* at 1. In other words, the subcommittee's amendment was designed to bridge the gap between Title VII and Title VI. The amendment, however, never reached the House floor.  *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 523 n. 13, 102 S.Ct. 1912, 1919, n. 13, 72 L.Ed.2d 299 (1982).

On April 6, 1971, a new education bill was introduced in the House.  *See* H.R. 7248, 92nd Cong. (1971).  This bill contained a provision similar to the amendment proposed by Representative Green's subcommittee nearly one year earlier.  Title X of H.R. 7248 prohibited gender discrimination in any education program or activity receiving federal financial support.  H.R.Rep. No. 92-554, at 108 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2462, 2511-12.  The House report on H.R. 7248 described this provision as a response to discriminatory admissions policies and employment practices at federally funded schools. *See id.*  Once again, neither the House report nor the underlying testimony discussed student-student sexual harassment.

---

[7]Title VII states, "It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex."  42 U.S.C. § 2000e-2(a)(1) (1994).

[8]Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d (1994).

While the House bill remained in committee, the Senate was considering a similar education bill. *See* S. 659, 92nd Cong. (1971). The Senate bill emerged from the Senate Committee on Labor and Public Welfare on August 3, 1971, without any antidiscrimination provision at all. Consequently, on August 5, 1971, Senator Birch Bayh introduced on the Senate floor an amendment to the committee's version of S. 659. *See* 117 Cong. Rec. 30,156. (1971). His amendment, like the House provision drafted by Representative Green's subcommittee, extended the antidiscrimination provisions of the Civil Rights Act of 1964 to gender discrimination by federally funded "institutions of higher learning."[9] *See id.* at 30,155. In defending his amendment, Senator Bayh did not discuss student-student sexual harassment, nor did he discuss school discipline. He focused on gender discrimination in school admissions and employment opportunities for female teachers. *See id.* at 30,155-56. In any event, the Senate rejected Bayh's amendment as non-germane, *id.* at 30,415, and the Senate passed S. 659 on August 6, 1971, without an antidiscrimination provision.

On November 3, 1971, the House began consideration of S. 659, as passed by the Senate. The House "amended" the Senate bill by striking virtually the entire contents of S. 659 and replacing it with the contents of H.R. 7248, including the antidiscrimination provision. *See* S.Rep. No. 92-604, at 1 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2595, 2595. The House made this change without official comment and passed its version of S. 659 on November 4, 1971. *See* 117 Cong. Rec. at 30,882.

On November 24, 1971, the Senate, by unanimous consent, referred the House version of S. 659 back to the Committee on Labor and Public Welfare, which proceeded to amend the House version to conform to the original Senate version. *See* S.Rep. No. 92-604, at 1-2 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2595, 2595-96. Once again, the committee did not discuss gender discrimination at all, much less sexual harassment among students. On February 7, 1972, the Senate

---

[9]Senator Bayh's first amendment provided, "No person ... shall, on the ground of sex, ... be subject to discrimination under any program or activity conducted by a public institution of higher education, or any school or department of graduate education, which is a recipient of Federal financial assistance for any education program or activity." 117 Cong. Rec. at 30,156.

committee sent its own version of S. 659 back to the floor of the Senate. *See* 118 Cong. Rec. 2806 (1972).

Once the bill returned to the Senate floor, Senator Bayh again introduced an amendment to add an antidiscrimination provision.[10] *See id.* at 5802-03. Bayh's proposal was intended to "close[ ] loopholes in existing legislation relating to general education programs and employment resulting from those programs." *Id.* at 5803. In support of his amendment, Senator Bayh stated,

> we are dealing with three basically different types of discrimination here[:] ... discrimination in admission to an institution, discrimination of [sic] available services or studies within an institution once students are admitted, and discrimination in employment within an institution, as a member of the faculty or whatever.

*Id.* at 5812. To counter these problems, Senator Bayh proposed a provision he thought would "cover such crucial aspects as admissions procedures, scholarships, and faculty employment, with limited exceptions." *Id.* at 5803. Yet again, no senator mentioned student-student sexual harassment or school discipline.

The Senate adopted Bayh's second amendment on February 28, 1972. *See* 118 Cong. Rec. at 5815 (1972). Because of irreconcilable differences between the House and Senate versions of S. 659, both Houses referred the bill to a conference committee. *See* S. Conf. Rept. No. 92-798, at 1 (1972). The conference committee reported out a joint bill containing the antidiscrimination measure now known as Title IX. The committee, however, did not explain its reasons for including Title IX. The conference bill passed both Houses and was signed into law on June 23, 1972. *See* 118 Cong. Rec. at 22,702. Throughout this long legislative history, the drafters of Title IX never discussed student-student sexual harassment or the related issue of school discipline.

### B.

While the legislative history of Title IX does not indicate that Congress authorized a private cause of action for studentstudent sexual harassment, the legislative history does show that Title IX

---

[10]Senator Bayh's second amendment stated, "No person ... shall, on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 118 Cong. Rec. at 5803.

was enacted under the Spending Clause of Article I. *See* U.S. Const. art. I, § 8, cl. 1.[11] When Congress conditions the receipt of federal funding upon a recipient's compliance with federal statutory directives, Congress is acting pursuant to its spending power. *See Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 598-99, 103 S.Ct. 3221, 3230-31, 77 L.Ed.2d 866 (1983) (opinion of White, J.). The legislative history of Title IX indicates that Congress intended to impose upon recipients of federal educational assistance a requirement of non-discrimination on the basis of sex. The Spending Clause authorized Congress to impose this condition.

Representative Green put it succinctly: "If we are writing the law, I would say that any institution could be all men or all women, but my own feeling is that they do it with their own funds and not taxpayers' funds." *Higher Education Amendments of 1971: Hearings on H.R. 32, H.R. 5191, H.R. 5192, H.R. 5193, and H.R. 7248 Before the Special Subcomm. on Education of the House Comm. on Education and Labor,* 92nd Cong., 1st Sess. 581 (1971). Representative Green also quoted with approval President Nixon, who had stated, "Neither the President nor the Congress nor the conscience of the Nation can permit money which comes from all the people to be used in a way which discriminates against some of the people." 117 Cong. Rec. at 39,257 (1971) (statement of Rep. Green). To Senator Bayh, the reach of Title IX was clearly restricted to federally funded institutions. *See* 118 Cong. Rec. at 5812. In support of Title IX, Senator McGovern stated, "I urge my colleagues to take every opportunity to prohibit Federal funding of sex discrimination." 117 Cong. Rec. at 30,158. This legislative history clearly shows that Congress intended Title IX to be

---

[11]Section 8 of Article I provides, in part, that "[t]he Congress shall have [the] Power To ... provide for the ... general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

a "typical "contractual' spending-power provision."[12] *Guardians Ass'n,* 463 U.S. at 599, 103 S.Ct. at 3231.

In addition to these indications of congressional intent, similarities between Title IX and Title VI indicate that Title IX was enacted pursuant to the Spending Clause. As noted above, Title VI prohibits recipients of federal funding from engaging in race discrimination. In *Guardians Association v. Civil Service Commission,* at least six members of the Supreme Court agreed that Title VI was enacted under the Spending Clause. *See* 463 U.S. at 598-99, 629, 638, 103 S.Ct. at 3230-31, 3247, 3251; *see also Lau v. Nichols,* 414 U.S. 563, 568-69, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974) (describing how a school district "contractually agreed to comply with title VI" when it accepted federal funding).

As Justice White quoted from the legislative history of Title VI, "It is not a regulatory measure, but an exercise of the unquestioned power of the Federal Government to fix the terms on which Federal funds shall be disbursed." *Guardians Ass'n,* 463 U.S. at 599, 103 S.Ct. at 3231 (quoting 110 Cong. Rec. 6546 (1964) (quoting *Oklahoma v. Civil Serv. Comm'n,* 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794 (1947))) (internal quotation marks omitted). Justice White summed up the legislative philosophy behind Title VI: "Stop the discrimination, get the money; continue the discrimination, do not get the money." *Guardians Ass'n,* 463 U.S. at 599, 103 S.Ct. at 3231

---

[12]The Supreme Court has left open the question of whether Title IX was enacted under the Spending Clause. *See Franklin,* 503 U.S. at 75 n. 8, 112 S.Ct. at 1038 n. 8. One could argue, as did the petitioner in *Franklin,* that Title IX was enacted under § 5 of the Fourteenth Amendment, which provides Congress with the authority to enact legislation preventing states from "deny[ing] to any person ... the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4.

The Equal Protection Clause, however, only protects against action by *state*-sponsored entities. *See Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Federal funding does not make a public school a state actor. *See Blackburn v. Fisk University,* 443 F.2d 121, 123 (6th Cir.1971). Thus, if Title IX had been enacted under the Fourteenth Amendment, then the antidiscrimination provision of Title IX would not reach federally funded schools that were not state actors. We think that the plain language of Title IX commands a different result: no school that receives federal funding may discriminate on the basis of gender. Therefore, we conclude that Title IX was enacted pursuant to a power that can reach non-state actors as well as state actors—the spending power. *See Rowinsky,* 80 F.3d at 1013 n. 14.

13

(quoting 110 Cong. Rec. at 1542) (internal quotation marks omitted).  This interpretation matches the plain language of Title VI, which conditions the disbursement of federal funds on the recipient's agreement not to discriminate on the basis of race.  *See* 42 U.S.C. § 2000d (1994).

The language of Title IX is virtually identical to the language of Title VI. *See* 117 Cong. Rec. at 30,156 (statement of Sen. Bayh).  The only differences are the substitution of the words "on the basis of sex" for the words "on the ground of race, color, or national origin" and the insertion of the word "educational" in front of the words "program or activity." *See Grove City College v. Bell,* 465 U.S. 555, 586, 104 S.Ct. 1211, 1228, 79 L.Ed.2d 516 (1984) (Brennan, J., concurring in part and dissenting in part);  *compare* 42 U.S.C. § 2000d *with* 20 U.S.C. § 1681(a).  Not surprisingly, the Supreme Court has found that "Title IX was patterned after Title VI." *Cannon,* 441 U.S. at 694, 99 S.Ct. at 1956.

The Supreme Court's study of the legislative history of Title IX has led it to conclude that the drafters of Title IX intended that courts interpret it in the same way they have interpreted Title VI. *Id.* at 696, 99 S.Ct. at 1957.  Therefore, we find that Title IX, like Title VI, was enacted under Congress' power to spend for the general welfare of the United States.  *See Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 654 (5th Cir.1997);  *Lieberman v. University of Chicago,* 660 F.2d 1185, 1187 (7th Cir.1981), *cert. denied,* 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982).  We now consider the implications of this finding.

### III.

### A.

When Congress enacts legislation pursuant to the Spending Clause, it in effect offers to form a contract with potential recipients of federal funding.  *See Pennhurst v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981).  Recipients who accept federal monies also accept the conditions Congress has attached to its offer.  *See South Dakota v. Dole,* 483 U.S. 203, 206, 107 S.Ct. 2793, 2795-96, 97 L.Ed.2d 171 (1987).  A prospective recipient is free to decline a grant of federal funding.  *See New York v. United States,* 505 U.S. 144, 168, 112 S.Ct. 2408, 2424, 120

14

L.Ed.2d 120 (1992). Similarly, a current recipient may withdraw from a federal program and decline further funding if it so chooses. *See Guardians Ass'n,* 463 U.S. at 596, 103 S.Ct. at 3229. The freedom of recipients to decline prospectively or to terminate retrospectively a grant of federal funding ensures that they will remain responsive to the preferences of their local constituents. *See New York,* 505 U.S. at 168, 112 S.Ct. at 2424.

To ensure the voluntariness of participation in federal programs, the Supreme Court has required Congress to give potential recipients unambiguous notice of the conditions they are assuming when they accept federal funding. *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540. A spending power provision must read like a prospectus and give funding recipients a clear signal of what they are buying. The Court has explained, "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* With regard to the case at hand, "Congress must be unambiguous in expressing to school districts the conditions it has attached to the receipt of federal funds." *Canutillo Indep. Sch. Dist. v. Leija,* 101 F.3d 393, 398 (5th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997). We therefore consider whether Congress gave the Board unambiguous notice that it could be held liable for failing to stop G.F.'s harassment of LaShonda.

Appellant and the United States Department of Justice, as *amicus curiae,* argue that Title IX gave the Board clear notice of this form of liability. Appellant points to the Supreme Court's decision in *Franklin.* In *Franklin,* the Court suggested that "th[e] notice problem does not arise in a case ... in which intentional discrimination is alleged." 503 U.S. at 74-75, 112 S.Ct. at 1037. The Court stated that the plain language of Title IX imposes on schools a duty not to discriminate on the basis of sex, and when a school teacher sexually harasses a student, that teacher is discriminating on the basis of sex. *Id.* at 75, 112 S.Ct. at 1037. Appellant argues that a school employee is intentionally discriminating on the basis of sex when he or she fails to prevent one student from

15

sexually harassing another.[13]  Hence, appellant asserts that the school board here had sufficient

---

[13]Appellant and the Department of Justice argue that we should use Title VII standards of liability to interpret Title IX. An employer is directly liable under Title VII if it is deliberately indifferent to peer sexual harassment in the workplace. *See Faragher v. City of Boca Raton,* 111 F.3d 1530, 1538-39 (11th Cir.1997) (en banc).  Appellant argues that a school should also be liable if it is deliberately indifferent to peer sexual harassment at school.

The superficial appeal of this argument has attracted the adherence of a few courts. *See, e.g., Bruneau,* 935 F.Supp. at 170-71.  These courts have applied Title VII standards of liability to Title IX cases simply because (1) Title VII and Title IX both deal with sexual harassment and (2) the Supreme Court once cited a Title VII case in discussing liability under Title IX, *see generally Franklin,* 503 U.S. at 75, 112 S.Ct. at 1037 (quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)).  *See Bruneau,* 935 F.Supp. at 170-71.

However, the Supreme Court has never discussed student-student sexual harassment or generally applied Title VII jurisprudence to Title IX cases.  Perhaps for this reason, some courts that have imposed Title VII-type liability under Title IX have refused—without much explanation—to apply *all* of Title VII jurisprudence to Title IX. *See, e.g., Bruneau,* 935 F.Supp. at 169-70 ("[T]he Court cautions that by holding that Title VII legal standards apply to an analysis of Title IX claims, the Court is *not* holding that the entirety of Title VII jurisprudence must be applied to Title IX.").  Other courts have altogether refused to apply Title VII jurisprudence to Title IX. *See, e.g., Rosa H.,* 106 F.3d at 656 ("*Franklin* 's single citation to *Meritor Savings* to support the Court's conclusion that sexual harassment is sex discrimination does not by itself justify the importation of other aspects of Title VII law into the Title IX context.").

We decline appellant's invitation to use Title VII standards of liability to resolve this Title IX case. *See Doe v. Petaluma City Sch. Dist.,* 54 F.3d 1447, 1450-51 (9th Cir.1994).  First, Title VII and Title IX are worded differently.  If Congress wished Title IX to be interpreted like the earlier-enacted Title VII, Congress would have written Title IX to read like Title VII. Congress did not.  Interpreting the plain language of different statutes does not automatically produce the same result simply because both statutes proscribe similar behavior.

Second, Title VII was enacted under the far-reaching Commerce Clause and § 5 of the Fourteenth Amendment. *See E.E.O.C. v. Pacific Press Publ'g Ass'n,* 676 F.2d 1272, 1279 n. 10 (9th Cir.1982).  Title IX was not, and consequently its reach is narrower.

Third, the exposition of liability under Title VII depends upon agency principles. *See Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408; *Faragher,* 111 F.3d at 1534-36.  Agency principles are useless in discussing liability for student-student harassment under Title IX, because students are not agents of the school board. *See generally* Restatement (Second) of Agency § 1 (1958) (defining an agency relationship as one in which the principal consents to representation by the agent and the agent consents to control by the principal).  Therefore, even if employers owe to employees some sort of nondelegable duty to eliminate peer harassment in the workplace, *see generally id.* § 492 (discussing employers' duty to provide reasonably safe working conditions for their employees), schools owe to students no comparable duty.  In short, Title VII jurisprudence does not

notice, for purposes of the Spending Clause, that it could be held liable. We disagree.[14]

The terms of Title IX gave educational institutions notice that they must prevent their employees from themselves engaging in intentional gender discrimination. *See Franklin,* 503 U.S. at 75, 112 S.Ct. at 1037. Thus, school administrators cannot deny admission to female applicants because of their gender. *See Cannon,* 441 U.S. at 709, 99 S.Ct. at 1964. School administrators cannot discriminate against teachers on account of sex. *See North Haven Bd. of Educ.,* 456 U.S. at

---

control the outcome of this case.

[14]We note that neither this court nor the Supreme Court in *Franklin* fully addressed the question of whether a student can state a claim under Title IX for sexual harassment by a teacher—much less whether a student can state a claim under Title IX for sexual harassment by another student.

The defendant school board in *Franklin* successfully moved the district court to dismiss Franklin's Title IX suit on the ground that "compensatory relief is unavailable for violations of Title IX," a holding which this court affirmed. *Franklin v. Gwinnett County Pub. Schs.,* 911 F.2d 617, 618 (11th Cir.1990). The school board apparently conceded on appeal that the plaintiff's allegations stated a claim under Title IX. *See id.* at 619.

Similarly, the school board conceded before the Supreme Court that teacher-student sexual harassment violated Title IX. *See* Brief for Respondents at 2, 7, *Franklin v. Gwinnett County Sch. Dist.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). The Supreme Court granted certiorari to consider "whether the implied right of action under Title IX ... supports a claim for monetary damages." *Franklin,* 503 U.S. at 62-63, 112 S.Ct. at 1031. The Court emphasized that "the question of what remedies are available under a statute that provides a private right of action is "analytically distinct' from the issue of whether such a right exists in the first place." *Id.* at 65-66, 112 S.Ct. at 1032. In fact, the *Franklin* Court rejected the arguments of the United States as *amicus curiae* precisely because those arguments concerned the existence *vel non* of a cause of action for teacher-student sexual harassment, a question which the Court considered "irrelevant." *Id.* at 69, 112 S.Ct. at 1034.

The *Franklin* Court discussed the notice element of the Spending Clause solely to counter the school board's argument that "the normal presumption in favor of all appropriate remedies should not apply because Title IX was enacted pursuant to Congress' Spending Clause power." *Id.* at 74, 112 S.Ct. at 1037. Viewed in this light, the Supreme Court's suggestion that teacher-student sexual harassment gives rise to a cause of action under Title IX was arguably dicta. We assume that *Franklin* created a cause of action for teacher-student sexual harassment under Title IX, but we are wary of extending this assumed holding to student-student sexual harassment. In any event, the Court's discussion of this issue does not foreclose our own consideration of whether appellant has stated a claim under Title IX.

530, 102 S.Ct. at 1922-23. Teachers cannot sexually harass their students. *See Franklin,* 503 U.S. at 74-75, 112 S.Ct. at 1037.

The present complaint, however, does not allege that a school employee discriminated against LaShonda in any of the foregoing ways. The complaint does not allege, for example, that Fort, Maples, Pippin, or Querry sexually harassed LaShonda. Rather, the complaint alleges that these individuals failed to take measures sufficient to prevent a *non-employee* from discriminating against LaShonda. We do not think that the Board was on notice when it accepted federal funding that it could be held liable in this situation.

B.

First, as we have noted, nothing in the language or history of Title IX suggests that Title IX imposes liability for student-student sexual harassment.[15] Second, the imposition of this form of liability would so materially affect schools' decisions whether to accept Title IX funding that it would require an express, unequivocal disclosure by Congress. Adopting appellant's theory of liability, however, could give rise to a form of "whipsaw" liability, under which public schools would face lawsuits from both the alleged harasser and the alleged victim of the harassment. Moreover, reasonable public school officials could perceive the likely number of such suits to be large. Because our endorsement of appellant's theory of liability would alter materially the terms of the contract between Congress and recipients of federal funding, appellant fails to state a claim upon which relief can be granted.

The essence of appellant's complaint is this: once a public school student complains to her teacher that a classmate has sexually harassed her, the teacher and the school board become subject

---

[15]The dissent devotes a great deal of attention to whether Congress intended that Title IX create a cause of action for student-student sexual harassment. *See Post,* at 3372-75. We seriously doubt whether Congress considered this problem at all when it enacted Title IX, but, in any case, the dissent's heavy reliance on its conclusory analysis of the language and history of Title IX is largely irrelevant. The question is not whether Congress intended to create a cause of action under Title IX for student-student sexual harassment but, rather, whether Congress gave school boards notice of this form of liability. In the absence of any supporting legislative history, statutory construction of ambiguous language cannot support a finding of notice as required by the Spending Clause.

to the threat of liability in money damages under federal law if they can prevent the classmate from harassing again and fail to do so.[16] *See, e.g., Bosley,* 904 F.Supp. at 1023 ("Once a school district becomes aware of sexual harassment, it must promptly take remedial action which is reasonably calculated to *end the harassment.*") (emphasis added). In practical terms, this means that school officials would have to isolate an alleged harasser from other students through suspension or expulsion.

The complaint devotes little attention to what measures the Board could have taken to avoid liability. The complaint admits that Querry and Fort tried to stop G.F.'s harassment by threatening him and by separating him from LaShonda within Fort's classroom. Appellant clearly does not believe that these measures sufficed. As evidence of "deliberate indifference," the complaint also alleges that the Board failed to create a school sexual harassment policy. It seems unlikely, however, that the mere existence of such a policy would foreclose liability under appellant's theory of the case.

Apparently, the appropriateness of the Board's remedial measures depends on whether the harassment actually ends. The complaint suggests that G.F. should have been "suspended, kept away from LaShonda, or disciplined in [some] way" after LaShonda complained. The Department of Justice argues broadly that a school board must take "effective action" in response to an allegation of harassment. We take these arguments to mean the same thing: a school board must immediately isolate an alleged harasser from other students to avoid the threat of a lawsuit under Title IX.

Physical separation of the alleged harasser from other students is the only way school boards can ensure that they cannot be held liable for future acts of harassment. If a school official simply tells the alleged harasser, "Don't do it again," and the harasser does it again, then the board becomes susceptible to the argument that it had the power to end the harassment, but failed to do so out of

_____

[16]Private schools that receive federal funding would also be subject to suit under appellant's theory of Title IX liability. Private school teachers and administrators, however, would not ordinarily be subject to suit under § 1983, as would their public school counterparts, because they would not ordinarily be acting under color of state law. *See* § 1983; *see generally supra,* n. 2. Accordingly, we discuss individual liability only with respect to public school employees.

"deliberate indifference." If the official merely transfers the alleged harasser to another classroom, the board faces the threat of suit for any acts of harassment committed by him in the new classroom—after all, the school had notice of his dangerous propensities and did not do all it could to prevent him from harassing his new classmates. Segregating the sexes into two separate programs within the same school would violate the spirit, if not the letter, of Title IX. Therefore, in practical terms, to avoid the threat of Title IX liability under appellant's theory of the case, a school must immediately suspend or expel a student accused of sexual harassment.[17]

Appellant's standard of liability therefore creates for school boards and school officials a Hobson's choice: On the one hand, if a student complains to a school official about sexual harassment, the official must suspend or expel the alleged harasser or the board will face potential liability to the victim. Moreover, if a public school official with control over the harasser finds out about his misconduct and fails to isolate him, that official runs the risk of personal liability under 42 U.S.C. § 1983 for depriving the victim of her Title IX rights if the harasser engages in further abuse.[18] *See Nicole M.,* 964 F.Supp. 1369, 1382; *Oona R.-S.,* 890 F.Supp. at 1462; *see also Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 723-24 (6th Cir.1996) (holding that the remedial scheme of Title IX does not preclude a section 1983 claim based on the same conduct).

On the other hand, if the public school official, presiding over a disciplinary hearing, suspends or expels the alleged harasser, the school board may face a lawsuit alleging that the official acted out of bias—out of fear of suit. The right to a public education under state law is a property

---

[17]This is the approach, incidentally, that some school boards have already adopted. *See, e.g.,* Tamar Lewin, *Kissing Cases Highlight Schools' Fears of Liability for Sexual Harassment,* N.Y. Times, Oct. 6, 1996, at A22, A22 ("While the recent suspensions of two little boys for kissing girls were widely seen as excessive, they highlight the confusion that is sweeping schools as educators grapple with a growing fear that they may be sued for failing to intervene when one student sexually harasses another.").

[18]If we were to rule in favor of appellant, Fort, Maples, Pippin, Querry, and Dumas would arguably be entitled to qualified immunity against § 1983 liability for their actions in this case. *See Doe v. Petaluma City Sch. Dist.,* 54 F.3d 1447, 1452 (9th Cir.1995). Ruling in favor of appellant, however, would deprive future, similarly situated defendants of qualified immunity, because it would clearly establish a statutory right of which a reasonable school employee would know.

20

interest protected by the Due Process Clause of the Fourteenth Amendment. *See Goss v. Lopez,* 419

U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). Accordingly, students facing a deprivation

of this right must be afforded due process.[19] *Id.* at 579, 95 S.Ct. at 738. A fair hearing in a fair

tribunal is a basic requirement of due process. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623,

625, 99 L.Ed. 942 (1955). The decisionmaker who presides over the hearing must be impartial.[20]

---

[19]If Georgia provided a procedure for challenging the impartiality of the school's decisionmaker, the alleged harasser would have received all the process to which he was entitled, and he would have no claim under the Due Process Clause. *See* McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir.1994) (en banc). Absent such a procedure, he could bring suit in federal court under § 1983, alleging that the state failed to accord him the process he was due. Whether the alleged harasser repairs to state court or to federal court, however, the disruptive effect on school officials, teachers, and students would be the same.

[20]In his separate opinion, JUDGE CARNES insists that the requirements of the procedural component of the Due Process Clause are met when a school disciplinarian affords a student faced with suspension an "informal" opportunity to explain his side of the story. *See Post,* at 3372-73. JUDGE CARNES' reasoning is correct, as far as it goes, but he focuses on one narrow subset of cases—"any suspension of up to ten days." *Post* at 3372.

     In *Goss,* the Supreme Court held that, "[a]t the very minimum, ... students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Id.* at 579, 95 S.Ct. at 738. The kind of notice and the formality of the hearing will depend, of course, on the nature and severity of the deprivation the student faces: for example, "due process requires, *in connection with a suspension of 10 days or less,* that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740 (emphasis added); *see also, e.g., Board of Curators v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978) (noting that a college student's dismissal for academic reasons necessitates fewer procedural protections than a dismissal for disciplinary reasons).

     At the end of its opinion in *Goss,* however, the Supreme Court stated, "Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than rudimentary procedures will be required." *Id.* at 584, 95 S.Ct. at 741. The Supreme Court left open the possibility that a more formal notice and hearing would be required for disciplinary actions more serious than ten-day suspensions, and so shall we.

     Furthermore, regardless of the nature of the notice and the quality of the hearing, an individual faced with the deprivation of a property interest is entitled to an impartial decisionmaker—a requirement JUDGE CARNES seems to discount. *See, e.g., Nash v. Auburn Univ.,* 812 F.2d 655, 665 (11th Cir.1987) ("An impartial decision-maker is an essential guarantee of due process."). JUDGE CARNES admits, for example, that a public school principal would be impermissibly biased, for purposes of the Due Process

21

*See Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *McKinney v. Pate,* 20 F.3d 1550, 1561 (11th Cir.1994) (en banc).

As we explain above, appellant's theory of the case could impose personal liability on any public school official who learns of an allegation of harassment and fails to exercise his authority to prevent a recurrence of the harassment. Were we to adopt appellant's theory of the case, therefore, public school officials would have a financial incentive to punish alleged student harassers. A financial incentive may render a decisionmaker impermissibly biased.[21] *See Gibson*

Clause, if the principal "took a bribe from [a] complaining student's parents in return for suspending or expelling [an] alleged wrongdoer." *Post,* at 3373. JUDGE CARNES, however, refuses to accept that a principal would be just as impermissibly biased if the principal were forced to *pay money* to a complaining student for *not* suspending or expelling an alleged wrongdoer. We fail to grasp the distinction.

[21]On page 3373-74 of his separate opinion, JUDGE CARNES leads us through a parade of horribles which, he imagines, we have created by suggesting that appellant's theory of the case would potentially give public school officials an impermissible financial incentive to punish alleged student harassers. The dire consequences he conjures, however, will never come to pass precisely because we are not adopting appellant's theory of Title IX liability. Only if we were to adopt her theory *might* public school officials face *potential* liability under both Title IX and the procedural component of the Due Process Clause. But we do not adopt appellant's theory of liability.

With regard to non-school settings, JUDGE CARNES overstates our opinion and then criticizes us for the breadth of our holding. He chides us for suggesting that "[a]ll federal, state, or local officials called upon to decide what to do in response to one person's complaint about another would have a financial incentive to avoid a lawsuit, which would disqualify them from making a decision." *Post,* at 3374. We suggest nothing of the kind.

Nevertheless, on the merits of his critique, we suppose that all officials in such situations *could face lawsuits* alleging impermissible bias—*if* none of those officials had any form of immunity from suit, which, of course, they *do* have. Stated differently, public decisionmakers have immunity from suit to protect them from the sort of bias which might otherwise give rise to violations of the Due Process Clause. Judges, for example, have absolute immunity from suit because "the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability." *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 435, 113 S.Ct. 2167, 2171, 124 L.Ed.2d 391 (1993). Similar concerns motivate qualified immunity. *See generally Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (reasoning that, without qualified immunity, "there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties' " (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2nd Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)) (alterations in original)). In fact, as we discuss *supra,* note 18, the individual

22

*v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). Therefore, the disciplinary measures required to avoid liability under Title IX could subject the school board to the threat of suit by the disciplined harasser.[22]

In addition to the threat of this whipsaw liability, schools would face the virtual certainty of extensive litigation costs. These costs would include not only lawyers fees, but also the burdens associated with the disruption of the educational process. The litigation we describe would inevitably involve teachers, students, and administrators in time-consuming discovery and trial preparation. Schools could reasonably expect to receive from Congress explicit notice of these consequences. They did not.[23]

defendants in this case would likely be entitled to qualified immunity.

In sum, we create no new procedural due process rights, as JUDGE CARNES asserts. Our opinion does not even suggest that we would *have to* create such rights if we were to uphold appellant's theory of Title IX liability. Rather, our opinion states that this form of liability is *a logical extension* of appellant's theory of the case, and Congress gave no notice to public school boards that they would be potentially undertaking this form of liability when they accepted federal funding under Title IX.

[22]All of the foregoing assumes, of course, that the allegations of harassment are true. While we hesitate to assume that any allegations of student-student sexual harassment are false, we do not doubt that school students will be tempted into mischief by the prospect of swift punishment against any classmate whom they accuse of sexual harassment.

Moreover, public school officials would find such false accusations difficult to combat. Under Title VII standards of liability, which the appellant, the United States, and the dissent seem anxious to adopt, an employer may be sued for retaliating against an employee who complains about sexual harassment. *See generally* 42 U.S.C. § 2000e-3(a) (1994) ("It shall be an unlawful employment practice for an employer ... to discriminate against any individual ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). Thus, under the logical implications of appellants theory of Title IX liability, a school board could face a lawsuit from the complaining student if it disciplines her for bringing a vexatious complaint against a classmate. As discussed in the text, the threat of lawsuits under § 1983 against the public school officials themselves would soon follow.

[23]Appellant and the Department of Justice draw our attention to the regulatory activities of the Office of Civil Rights of the United States Department of Justice ("OCR"). The OCR issued interim guidelines concerning schoolhouse sexual harassment on August 16, 1996. *See* Sexual Harassment Guidance: Peer Sexual Harassment, 61 Fed.Reg. 42,728 (1996). These guidelines issued after the alleged harassment of LaShonda. Moreover, at the time of the alleged harassment, the code of federal regulations did not discuss student-student sexual harassment.

*See* 34 C.F.R. § 106.31 (1992). Therefore, OCR's regulations did not put the Board on official notice of its potential liability for G.F.'s harassment of LaShonda.

Nevertheless, appellant and the Department of Justice urge that we defer to the OCR's current interpretation of Title IX for purposes of this case. The OCR issued final policy guidance on student sexual harassment on March 13, 1997. *See* Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed.Reg. 12,034 (1997). In this publication, the OCR constructs a labyrinth of factors and caveats which simply reinforces our conclusion that the Board was not on notice that it could be held liable in the present situation.

According to the March 13 guidance, schools are liable for failing to eliminate

> sexually harassing conduct (which can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature) ... by another student ... that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment.

*Id.* at 12,038.

Because the meaning of this language may not be obvious to school officials, the March 13 guidance lists several factors which should be taken into account when a student is sent to the office for sexually harassing another student. Among other factors and subfactors, the school official should consider the "welcomeness" of the conduct, the age of the harasser, the age of the victim, the relationship between the parties, the degree to which the conduct was sexual in nature, the duration of the conduct, the frequency of the conduct involved, the degree to which the conduct affected the victim's education, the pervasiveness of the conduct at the school, the location of the incident, the occurrence of any similar incidents at the school, the occurrence of any incidents of gender-based but non-sexual harassment, the size of the school, and the number of individuals involved in the incident.

The school official should keep in mind that "in some circumstances, nonsexual conduct may take on sexual connotations and may rise to the level of sexual harassment." *Id.* at 12,039. He should also remember that "a hostile environment may exist even if there is no tangible injury to the student," and even if the complaining student was not the target of the harassment. *Id.* at 12,041. In addition, the official must recall that a single act of student-student harassment can create a hostile environment. *See id.* Finally, the school official must keep in mind that, if he does not kick the alleged harasser out of school, and the harasser misbehaves again, the official could be personally liable if a jury concludes, after the fact, that he could have done more to prevent the harasser from harming his classmates.

The foregoing analysis assumes, of course, that the school official actually knew of the complaint against the harasser and summoned him to the front office. According to the OCR, however, the official may be liable even if he did not know about the harassment: the official may cause the school to violate Title IX if he failed to exercise "due care" in discovering the misconduct. *See id.* at 12,042. The foregoing does not address the lawsuit that the harasser's parents will file when the school official summarily

24

C.

School boards could reasonably believe that this form of whipsaw liability would arise in a substantial number of cases. According to a 1993 survey of American public school students, 65% of students in grades eight to eleven were victims of student-student sexual harassment. *See American Ass'n of Univ. Women Educ. Found., Hostile Hallways: The AAUW Survey on Sexual Harassment in American Schools* 11 (1993) [hereinafter *AAUW* Survey]. Extrapolating from Department of Education statistics, roughly 7,784,000 public school students in grades eight through eleven would consider themselves to be victims of student-student sexual harassment.[24] Furthermore, 59% of students (including 52% of female students) in grades eight to eleven responded that they had sexually harassed other students. *See AAUW* Survey, *supra,* at 11-12. Thus, if this survey is accurate, around 7,177,000 public school students in grades eight to eleven, male and female, would admit to sexually harassing other students.

We do not adopt these statistics as our own definitive guide to the extent of sexual harassment in America's public schools. We draw attention to these figures only to illustrate what school boards would have to consider in deciding whether to accept federal funding under Title IX. The *AAUW Survey* could suggest to reasonable public school officials that a substantial number of lawsuits will be brought under appellant's theory of Title IX liability. Therefore, imposition of this

---

suspends him. According to appellant and the Department of Justice, the Board received clear notice of this form of liability when it accepted federal funding under Title IX. We think not.

[24]To calculate the number of purported student victims of harassment in the nation, we multiplied the percentage of victims provided by the AAUW Survey by the total number of students enrolled in public schools in grades eight to eleven during the 1992-1993 school year. We obtained the enrollment statistics from the world-wide-web home page of the Department of Education. *See, e.g.,* U.S. Dep't of Educ., *Enrollment in Public Elementary and Secondary Schools, by Grade: Fall 1980 to Fall 1994* (last modified Mar. 1996) http://nces01.ed.gov/nces/ pubs/D96/D96T042.html> [hereinafter *U.S. Education* ]. We used the same process to calculate the total number of professed student harassers in the nation.

form of liability would materially affect their decision whether to accept federal educational funding.[25]

An enactment under the Spending Clause must read like a prospectus. Just as a prospectus must unambiguously disclose all material facts to a would-be purchaser, an enactment under the Spending Clause must unambiguously disclose to would-be recipients all facts material to their decision to accept Title IX funding. The threat of whipsaw liability in a substantial number of cases would materially affect a Title IX recipient's decision to accept federal funding, yet Congress did not provide unambiguous notice of this type of liability in the language or history of that statute. We will not alter retrospectively the terms of the agreement between Congress and recipients of Title IX funding.[26]

---

[25]In JUDGE CARNES' separate opinion, he characterizes our use of statistics as an attempt "to establish that student-student sexual harassment is such a widespread and extensive problem that a different holding of this case would impose massive liability upon school officials and boards." *Post,* at 3375. As we indicate in the text, this is not our objective at all. We cite these statistics because *school boards* may consider them to be a valid indicator of the amount of litigation that they will face. If a lawyer for the Monroe County School Board were trying to advise the Board about the potential costs and benefits of accepting federal funding, would it not matter to that lawyer whether accepting federal funds would give rise to a few lawsuits or thousands of lawsuits?

> JUDGE CARNES suggests that the AAUW Survey overstates the actual number of lawsuits that could be brought under appellant's theory of Title IX liability. We agree that the survey did not use the same definition of student-student sexual harassment as our case law dictates, but statistical purity would arguably require a jury verdict agreeing with the allegations of each student who claimed to have been harassed. In any event, there are plenty of reasons for public school officials to overlook the statistical flaws in the AAUW Survey when it is their own pocketbooks—not those of federal judges—that are at stake.

[26]As noted above, the purpose of enactments under the Spending Clause is "to further [Congress's] broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Fullilove v. Klutznick,* 448 U.S. 448, 474, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.). Congress uses the spending power "to induce governments and private parties to cooperate voluntarily with federal policy." *Id.* If no one chooses to receive federal funds under a proposed legislative program, Congress's intent would be frustrated and its policy objectives would remain unfulfilled. *See Rowinsky,* 80 F.3d at 1013.

> Prospective recipients will decline federal funding and current recipients will withdraw from federal programs if the cost of legislative conditions exceeds the amount of the disbursement. Federal funding represents only 7% of all revenues for public

IV.

We condemn the harm that has befallen LaShonda, a harm for which Georgia tort law may indeed provide redress. Appellant's present complaint, however, fails to state a claim under Title IX because Congress gave no clear notice to schools and teachers that they, rather than society as a whole, would accept responsibility for remedying student-student sexual harassment when they chose to accept federal financial assistance under Title IX. Accordingly, the judgment of the district court is AFFIRMED.

EDMONDSON, COX, BIRCH, DUBINA, BLACK and CARNES, Circuit Judges, concur in the court's opinion with the exception of Parts III.B and III.C.

BLACK, Circuit Judge, concurring:

I concur in the Court's judgment and, with the exception of Parts IIIB and IIIC, join in its opinion. I write separately only to respond to the dissent's contention that the Court's disposition contravenes the "plain meaning" of Title IX. It is axiomatic that the statutory language is the starting point for interpreting the meaning of a statute. *Ardestani v. INS,* 502 U.S. 129, 135, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991); *United States v. McLemore,* 28 F.3d 1160, 1162 (11th Cir.1994). If the statutory language is unambiguous, the courts must enforce the statute as written absent a clearly-expressed legislative intent to the contrary. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *RJR Nabisco, Inc. v. United*

elementary and secondary schools in the United States. During the 1992-1993 school year, for example, American schools received $17,261,252,000 from the federal government out of a total budget of $247,626,168,000. *See U.S. Education, supra,* at <D96T157.html>.

School authorities must weigh the benefit of this relatively small amount of funding against not only the threat of substantial institutional and individual liability—as suggested by the AAUW Survey—but also the opportunity costs of devoting to litigation hours that might otherwise be spent running their schools. Because harassment of the sort experienced by LaShonda is rarely observed directly by school officials, Title IX claims of the sort envisioned by appellant would require the time-consuming testimony of numerous student witnesses. Imposing the liability of the sort envisioned by appellant could induce school boards to simply reject federal funding—in contravention of the will of Congress. *See Rowinsky,* 80 F.3d at 1013.

*States,* 955 F.2d 1457, 1460 (11th Cir.1992). On the other hand, where the statutory language is ambiguous, then a court may look to legislative history in an effort to discern the intent of Congress. *See Royal Caribbean Cruises, Ltd. v. United States,* 108 F.3d 290, 293 (11th Cir.1997); *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1498 (11th Cir.1991).

The present case requires us to decide whether Title IX prescribes liability for the failure of a school board to prevent a student from discriminating against a classmate on the basis of sex. The text of Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (1994). As the dissent recognizes, "[t]he absolute prohibition contained in the text is framed solely in terms of who is protected." The statute simply does not specify what relationship, if any, the perpetrator of an underlying act of sexual harassment must have to the federally-funded educational institution to trigger Title IX liability.

The dissent nevertheless divines from congressional silence an unambiguous endorsement of the proposition that "[t]he identity of the perpetrator is simply irrelevant." Under this conception of Title IX, liability presumably would attach anytime the school board failed to prevent anyone—student, teacher, parent, neighborhood resident—from discriminating on the basis of sex to the extent that such action inhibited a student from realizing the full benefits of federally-funded education. In my view, the text of Title IX permits at least equally plausible constructions that would circumscribe liability more narrowly. Specifically, the text of Title IX may be interpreted to impose liability only when the school board or one of its agents bears direct responsibility for discriminating on the basis of sex, as would be the case had any of Lashonda Davis' teachers participated in the sexual harassment she was forced to endure. The absence of any reliable textual indication regarding which of these constructions Congress envisioned invites consideration of legislative history and the congressional power from which the statute emanates in an effort to discover congressional intent. The Court's approach thus represents an entirely appropriate effort

28

to effectuate congressional will in the absence of unambiguous textual guidance, not, as the dissent appears to suggest, strident judicial refusal to enforce clearly expressed legislative intent.

CARNES, Circuit Judge, concurring:

I concur in the holding that Title IX does not create a cause of action against public school boards or officials for failure to prevent or remedy student-student sexual harassment. In my view, that holding is correct for essentially those reasons stated in Parts I, II, III A, and IV of Judge Tjoflat's opinion, and I join those parts of it, which constitute the opinion of the Court. However, for the reasons explained below, I do not join Parts III B and C of Judge Tjoflat's opinion, which express only his own views.[1]

I.

The "Hobson's choice" or "whipsaw liability" discussion in Part III B of the opinion is based upon a fundamentally erroneous premise. If school officials could be sued for failing to prevent or remedy student-student sexual harassment, that part of the opinion says, the potential liability would amount to a financial incentive to punish the accused harassers, which would or could render school officials impermissibly biased and require recusal. Of course, a student does have a property interest in a public education which is protected by the Due Process Clause of the Fourteenth Amendment.[2]

_____

[1]Parts I, II, III A, and IV of Judge Tjoflat's opinion constitute the opinion of the Court, because those parts are joined by six of the ten judges participating in this decision. By contrast, none of the other nine judges participating in this decision have joined Parts III B and C of that opinion.

[2]The nature and extent of the protection afforded the property interest in a public education, the due process requirements attendant to its loss, depends upon the severity of the loss. In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court held that, with any suspension of up to ten days, all the Due Process Clause requires is for the student to "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581, 95 S.Ct. at 740; *accord Arnold v. Board of Educ.,* 880 F.2d 305, 318 (11th Cir.1989). The Supreme Court said in *Goss* that "[i]n the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred," and "[w]e hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." 419 U.S. at 582, 95 S.Ct. at 740. The Court has since explained that all *Goss* requires before a suspension is an "informal give and take" in order to provide the student "the opportunity to characterize his conduct and put it in what he deems the proper context." *Board*

And, due process does require that a decision depriving the student of that property interest be made by someone who does not have a pecuniary interest in having the student suspended or expelled. To take an extreme example, regardless of any other process afforded, due process would be violated if a principal took a bribe from the complaining student's parents in return for suspending or expelling the alleged wrongdoer. But it is an entirely different matter to suggest, as Part III B of the opinion does, that a school official's *potential* liability to the complaining student *if* that official fails to take legally *required* action amounts to a "financial incentive" which renders that official "impermissibly biased" and requires recusal from deciding what action, if any, is required in the circumstances. As authority for that novel proposition, the opinion cites only *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). The *Gibson* decision provides no support for the proposition, because it does not hold, or even imply, that an official's potential liability for failing to properly exercise decisionmaking authority constitutes a "financial incentive" which renders the official "impermissibly biased."

*Gibson* involved a state optometry board composed exclusively of private practitioners who were in competition with corporate employee optometrists. Those board members had a substantial pecuniary interest in excluding from the market corporate employee optometrists, who accounted for nearly half of all the practicing optometrists in the state. The Supreme Court affirmed the district court's holding that the private practitioner's pecuniary interest in eliminating competition disqualified them from deciding whether the practice of optometry by corporate employees as such constituted unprofessional conduct justifying license revocation. *See* 411 U.S. at 578-79, 93 S.Ct. at 1698. That holding does not support the proposition that any time an official can be sued for failing to respond properly to a complaint that official is disqualified from making a decision about how to respond to the complaint.

---

*of Curators v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978) (quoting *Goss,* 419 U.S. at 584, 95 S.Ct. at 741); *accord, e.g., C.B. v. Driscoll,* 82 F.3d 383, 386 (11th Cir.1996) ("The dictates of *Goss* are clear and extremely limited."). These "rudimentary precautions," to use the description from *Goss* itself, 419 U.S. at 581, 95 S.Ct. at 740, are a far cry from a due process tribunal hearing attendant to some property interest deprivations.

If that suggested proposition were the law of this circuit—and thankfully it is not—no school official could ever discipline a student for any alleged misconduct as a result of another student's complaint without violating the due process rights of the disciplined student. The reason such an imposition of discipline would violate due process is that such an official would always have a financial incentive, under that view, to believe the complaint in order to avoid a lawsuit filed by the complainant. The ramifications of such a rule would extend to discipline for any type of misconduct, because there is no principled basis on which a distinction can be drawn between discipline following a complaint about sexual harassment and that following a complaint about any other type of misconduct.

Nor is there any principled basis by which such an automatic disqualification rule could be confined to school settings. It would also apply outside the Title IX context; for example, in jail and prison settings. If one prisoner complains to a jailer or warden about what some other prisoner has done to him, under Judge Tjoflat's view that official will have a financial interest in avoiding a lawsuit from the complaining prisoner (alleging deliberate indifference), and such an interest disqualifies the official from making any disciplinary decision about the complaint. So, not only would the disqualification rule be automatic, it also would be universal. No one would be able to decide any disciplinary matters in schools, in prisons, or in any other setting within the purview of the Due Process Clause. All federal, state, or local officials called upon to decide what to do in response to one person's complaint about another would have a financial incentive to avoid a lawsuit, which would disqualify them from making a decision. That cannot be the law, and it is not the law.

Judge Tjoflat's response to having these flaws in his reasoning pointed out is contained in footnote 21 of his opinion, which will reward close scrutiny. First, that footnote assures us that we should not worry about the far-reaching ramifications of the suggestion that potential liability equals disqualifying bias, because this Court is holding that school officials have no liability under Title IX for student-student sexual harassment. Apparently forgotten is the assurance, in Part IV of the

31

opinion, that "Georgia tort law may indeed provide redress" for the very same conduct. If a school official's potential liability for not acting properly is a disqualifying financial interest, it matters not whether that potential liability is posed by Title IX or by state tort law. The opinion does not, and logically cannot, suggest otherwise. Instead, it adopts a head-in-the-sand approach which ignores everything but Title IX, as though that were the only potential source of liability for school officials who are called upon to decide what to do about student-student sexual harassment complaints.

With its head comfortably in the sand, the opinion also ignores entirely the obvious implications of its proposition for student-student disputes involving allegations of misbehavior other than sexual harassment. Part of the quotidian business of teachers and principals is resolving disputes in which one student alleges another has threatened, hit, stolen from, or otherwise mistreated him or her. Some of those disputes pose potential liability for the teacher or principal who fails to act. For example, a school official who fails to take appropriate action to protect a student from a threatened thrashing at the hands of another student may have to answer in a state court tort action. Under the reasoning contained in Part III B of the opinion, that potential liability would prevent any school official from deciding what to do about such a complaint, because that official's potential liability to the complaining student would amount to a disqualifying financial bias. A careful reading of the opinion reveals that it fails to explain why that result would not necessarily follow from its suggested reasoning.

As to settings outside the school context, footnote 21 of the opinion offers two responses to this criticism. First, it simply denies—"We suggest nothing of the kind"—that its proposition about potential liability equaling disqualifying bias would have any application outside the schoolhouse. That *ipse dixit* assertion has as little reasoning behind it as the proposition itself. The opinion fails to offer any reason why the automatic bias theory it suggests would not apply in non-school contexts, because there is no reason. The right to an unbiased decision maker is a rudiment of due process, which is as applicable outside schools as within them.

32

Apparently realizing that the *ipse dixit* approach will not shield the naked illogic of its position from view, the opinion attempts to camouflage the problem with talk of immunity. "Don't worry," we are told, officials in non-school settings have "immunity from suit" which removes any potential liability for failing to decide for the complaining party, and any financial incentive to favor that party disappears along with the potential liability. The thinnest stripe of the attempted camouflage is the opinion's reference to judicial immunity. We are not talking about judges. We are talking about the myriad of federal, state, and local non-judicial officials who are regularly called upon to decide what to do in response to one person's complaint about another. Jailers, wardens, and other corrections officials are but a few examples. These people are not judges. They do not enjoy judicial immunity.

Even so, the opinion says, there is qualified immunity. There are three problems with the assertion that the availability of qualified immunity distinguishes non-school officials from school officials by removing any threat of lawsuit by a complaining party dissatisfied with an official's resolution of a complaint outside the school setting. First, qualified immunity is not absolute. Second, qualified immunity does not shield officials from liability grounded on state law. Third, and most obviously, the doctrine of qualified immunity is the same for school officials as for non-school officials. If that doctrine shields non-school officials from threat of lawsuit sufficiently to remove any disqualifying financial incentive to decide for a complainant, it does exactly the same for school officials. Thus, with its talk of qualified immunity, Part III B of the opinion has succeeded in reaching around and biting itself in the back. If what the plurality opinion says about the due process implications of qualified immunity is true, then the opinion has disproven the very proposition it is seeking to defend.

II.

Part III C of Judge Tjoflat's opinion attempts to establish that student-student sexual harassment is such a widespread and extensive problem that a different holding in this case would impose massive liability upon school officials and boards. In its words, agreeing with appellant's

33

theory of liability would give rise to "thousands of lawsuits." Tjoflat Opinion at n.25. The factual premise of that reasoning is based entirely upon one survey report. *See* American Ass'n of Univ. Women Educ. Found., *Hostile Hallways: The AAUW Survey on Sexual Harassment in American Schools* (1993) (hereinafter "*AAUW Survey Report* ").

The *AAUW Survey Report* was not the subject of an evidentiary hearing in the district court, nor has it been examined in a hearing in any other court insofar as we know. Neither party to this appeal even mentioned the survey in the briefs; it was discussed only in one amicus brief. In general, we should be reluctant to incorporate into our reasoning the results of a survey that has not been examined critically or tested in a trial or evidentiary hearing, the time-honored and proven methods our system of justice uses to determine material facts.

Beyond the general problems with using surveys in judicial decision making, there are specific reasons why employment of this particular survey for the purpose Judge Tjoflat uses it in Part III C of his opinion is ill-advised. That purpose, of course, is to show student-student sexual harassment is so rampant that if a cause of action existed for it the resulting flood of litigation would inundate our public school systems, or at least school officials would have a basis for fearing that result—the basis being the survey.

The first reason we ought to be especially cautious about such a use of this particular survey is that its purported findings are, in the words of the sponsors of the survey: "startling," and for some "the results will be surprising and shocking." *Id.* at 2. The reason for such descriptions is that it is difficult to believe that 65 percent of all eighth through eleventh grade students have been sexually harassed by other students, and that half of all female and male students in those grades are self-professed sexual harassers. We ought to be reluctant to accept as fact, or assume that school officials would accept as fact, such "surprising and shocking" statistics based upon a single survey of only a tiny fraction of one percent of the total number of students in four grades.

Even a cursory look at the survey report gives more reason to be dubious about the opinion's use of the report. The survey asked students how often "[d]uring your whole school life" has anyone

"when you did not want them to" done any of the following things, and it then provided a list of behavior the survey defined as sexual harassment. *See id.* at 5. Some behavior on that list clearly constitutes sexually harassing behavior of the most serious type. But included in the list is other behavior that is less serious and far less likely to lead to complaints and litigation, which is what Judge Tjoflat uses the survey to predict (or posits that school boards will use it to predict). For example, included in the survey's definitional list of sexual harassment was any instance in which another student: "Made sexual comments, jokes, gestures, or looks;" or "[s]pread sexual rumors about you;" or "[s]aid you were gay or lesbian." *Id.* at 5. Remember that a single unwelcome instance of such activity, during the student's entire school life, renders that student a victim of sexual harassment for purposes of the survey.

A student who has ever been looked at by another student in an unwelcome way perceived to be sexual is defined by the survey to be a sexual harassment victim. Any student ever called gay or lesbian is also a sexual harassment victim in the survey's view. Any time unwelcome rumors are spread about a student having any type of sexual activity (presumably including kissing) with another student, those students are sexual harassment victims as the survey defines it. To take one final example of how the total incidence of "sexual harassment" reported overstates legally actionable incidents of sexual harassment, consider that the survey definition includes incidents in which someone "[f]lashed or "mooned' you." *Id.* At 5. Suppose that a student at a school function (which the survey defines to include school sporting events and field trips) "moons" all the students in attendance, or all those from a rival school. A single episode of that misbehavior—which is not nice and certainly should not occur, but has been known to happen—could make sexual harassment victims, as the survey defines the term, out of scores or even hundreds of students. Yet, such an incident is extremely unlikely to result in litigation against the school.

It is also worthy of note that the survey asked students whether the behavior it defined as sexual harassment had happened to them "[d]uring your whole school life." *Id.* at 5. Therefore, the

35

65 percent figure reflects those who have experienced that behavior at any time during any school year of their life. It does not purport to be annual data.

Finally, Part III C of the opinion fails to point out that the survey also asked the students if any of them who had been sexually harassed, as that term was defined in the survey, had told a teacher about the experience. Only 7 percent of the sixty-five percent had. *See AAUW Survey Report* at 14. Whatever the reasons for not reporting such behavior to a teacher, the failure to do so in all but the rarest instances has obvious implications for the existence of causes of action against schools or the likelihood of actual litigation.

The opinion attempts to deflect criticism about misuse of the survey by suggesting that while the opinion's author does not necessarily think that the survey is a valid indicator of how much student-student sexual harassment occurs, school boards might think that the survey is and reject federal funding as a result of it. With all due respect, there is no reason to believe that school boards would be less likely than federal judges to see the flaws in such an interpretation of the survey. School boards know more about what is going on in their schools than we do, and they can be expected to critically examine any survey before using it as a basis for turning down federal funding for their schools. Rather than hiding behind speculation about how school board officials might interpret the survey, the opinion ought to face up to the flaws in its suggested use of the survey.

Upon its release, the sponsors of the survey stated that they were "confident that the results of this survey will become a focal point on the agendas of policy makers, educators, and others concerned with the education of America's children." *Id.* at 21. Their confidence about how the survey would be used might be undermined by Part III C of Judge Tjoflat's opinion. More importantly, we are not policymakers. We do not have agendas. We ought to leave this survey to those who do.

III.

The parts of Judge Tjoflat's opinion that neither I nor any other member of the Court except its author joins, Parts III B and C, are not necessary to the opinion's essential reasoning or to the

holding of this case. Neither the language of Title IX nor its legislative history indicates that Congress intended to saddle school boards and officials with liability for student-student sexual harassment, and school boards had no notice that such liability would result from accepting Title IX funds. For those reasons, I do join the holding of the Court and Parts I, II, III A, and IV of Judge Tjoflat's opinion.

BARKETT, Circuit Judge, dissenting, in which HATCHETT, Chief Judge, and KRAVITCH and HENDERSON, Senior Circuit Judges, join:

In this case it is alleged that a fifth-grade student, Lashonda Davis, was sexually harassed for over six months at school by another student, culminating in a sexual battery for which her harasser pled guilty in state court. It is also alleged that school officials were completely aware of the escalating gravity of the situation and took no meaningful action to deter it. The majority holds that no matter how egregious—or even criminal—the harassing discriminatory conduct may be, and no matter how cognizant of it supervisors may become—a teacher could observe it directly and regularly—there would be no obligation to take any action to prevent it under the very law which was passed to eliminate sexual discrimination in our public schools. To reach this conclusion the majority ignores the plain meaning of Title IX as well as its spirit and purpose. I suggest that under appropriate statutory analysis as well as Supreme Court precedent, Davis has stated a cause of action.

The first principle in statutory analysis requires that a statute be accorded the plain meaning of its text. It is well established that "[c]ourts must assume that Congress intended the ordinary meaning of the words it used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive." *Gonzalez v. McNary,* 980 F.2d 1418, 1420 (11th Cir.1993) (internal citation omitted). The Supreme Court has emphasized that "only the most extraordinary showing of contrary intentions from [legislative history] would justify a limitation on the "plain meaning' of the statutory language." *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984). The text of Title IX provides in pertinent part:

37

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681(a). There is no ambiguity in this language. It is undisputed that the Monroe County School System is a recipient of federal financial assistance. It is also well established that hostile environment sexual harassment is a form of intentional discrimination which exposes one sex to disadvantageous terms or conditions to which members of the other sex are not exposed. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *see also Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 75, 112 S.Ct. 1028, 1037-38, 117 L.Ed.2d 208 (1992) (hostile environment for student created by teacher is a form of discrimination cognizable under Title IX). The absolute prohibition contained in the text is framed solely in terms of who is protected. The identity of the perpetrator is simply irrelevant under the language: "No person ... shall ... be excluded from participation ..., be denied the benefits of, or be subjected to discrimination...." Thus, under the statute's plain language, liability hinges upon whether the grant recipient maintained an educational environment that excluded any person from participating, denied them benefits, or subjected them to discrimination.

Should one need to interpret the statute, it must initially be noted that Title IX was designed to protect individuals from sex discrimination by denying federal financial aid to those educational institutions that bear responsibility for sexually discriminatory practices. *Cannon v. University of Chicago,* 441 U.S. 677, 704 & n. 36, 99 S.Ct. 1946, 1961 & n. 36, 60 L.Ed.2d 560 (1979) (citing 117 Cong. Rec. 39252 (1971)). "It is a strong and comprehensive measure which ... is needed if we are to provide women with solid legal protection as they seek education and training for later careers...." *Id.* at 704 n. 36, 99 S.Ct. at 1961 n. 36 (quoting Sen. Birch Bayh, 118 Cong. Rec. 5806-07 (1972)). Thus, in interpreting Title IX, "[t]here is no doubt that if we are to give [it] the scope that its origins dictate, we must accord it a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982) (internal quotation marks omitted).

Moreover, the Office of Civil Rights of the Department of Education, the federal agency responsible for enforcement of Title IX, interprets the statutory language to impose liability on school officials for permitting an educational environment of severe, persistent, or pervasive peer sexual harassment when they know or should know about it, and fail to take immediate and appropriate corrective action to remedy it. *See* Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed.Reg. 12,034, at 12,039-41 (1997). The OCR's final policy guidance explains that:

> a school's failure to respond to the existence of a hostile environment within its own programs or activities permits an atmosphere of sexual discrimination to permeate the educational program and results in discrimination prohibited by Title IX.... Thus, Title IX does not make a school responsible for the actions of harassing students, but rather for its *own* discrimination in failing to remedy it once the school has notice.

*Id.* at 12,039-40 (emphasis added).[1]

---

[1] It is worth noting that the OCR's interpretation of Title IX as holding schools liable for permitting peer sexual harassment is consistent with its interpretation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1964), as holding schools liable for allowing peer racial harassment. This is significant because the Supreme Court has noted that "Title IX was patterned after Title VI." *Cannon,* 441 U.S. at 694, 99 S.Ct. at 1956. As the majority points out, the language of the two statutes is virtually identical, and the Supreme Court has held that they should be interpreted in the same way. *See* Majority Op. at 3362-63 (citing *Cannon,* 441 U.S. at 696, 99 S.Ct. at 1957-58). The OCR issued An Investigative Guidance on Racial Incidents and Harassment Against Students at Educational Institutions in 1994 providing, "[T]he existence of a racially hostile environment that is created, encouraged, accepted, tolerated or left uncorrected by a recipient also constitutes different treatment on the basis of race in violation of Title VI." *See* 59 Fed.Reg. 11,448, at 11,448 (1994). Furthermore, the OCR has stated that the obligation of school districts with notice to remedy racially hostile environments applies "regardless of the identity of the person(s) committing the harassment—a teacher, student, the grounds crew, a cafeteria worker, neighborhood teenagers, a visiting baseball team, a guest speaker, parents or others." *Id.* at 11,450. As explained by the OCR:

> Under this analysis, an alleged harasser need not be an agent or employee of the recipient, because this theory of liability under Title VI is premised on a recipient's general duty to provide a nondiscriminatory educational environment.

*Id.* at 11,449.

Additionally, it is interesting to note that shortly after the enactment of Title VI, the former Fifth Circuit recognized that school officials must take steps within their power to prevent racial harassment among students. In *United States v. Jefferson County Bd. of Educ.,* 380 F.2d 385 (5th Cir.1967) (en banc), which is binding precedent in this circuit, *see Bonner v. City of* Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the court of appeals entered a model desegregation decree which complied with "the

Notwithstanding the administrative interpretation of the statute, as well as its plain meaning, the majority concludes that Congress did not intend to create a cause of action under Title IX for student-on-student sexual harassment based largely on an analysis of legislative history. The majority emphasizes that "throughout this long legislative history, the drafters of Title IX never discussed student-student sexual harassment...." *See* Majority Op. at 3360. Assuming this to be true, the mere fact that student-on-student sexual harassment may not have been specifically mentioned in the Congressional debates does not mean that it was not encompassed within Congress's broad intent of preventing students from being "subjected to discrimination" in federally funded educational programs. The majority suggests that it is clear that Congress was not concerned with student-on-student sexual harassment because the legislative history focused primarily on the issues of discrimination in "admission[s]," "available services or studies," and "employment within an institution," none of which were pertinent to the claim raised in this case. *See* Majority Op. at 3358-59, 3360. However, under this narrow view, even the cause of action under Title IX for teacher-on-student sexual harassment recognized by the Supreme Court in *Franklin,* 503 U.S. at 60, 112 S.Ct. at 1028-29, would not be supported by the majority's view of legislative history. In *Franklin* the Court considered a high-school student's Title IX suit alleging that a teacher had sexually harassed and assaulted her and that school officials, who had knowledge of the misconduct, had failed to intervene. *Id.* at 63-64, 112 S.Ct. at 1031-32. Surely the majority would not suggest that the cause of action that the Supreme Court recognized in *Franklin* does not exist simply because it was not specifically mentioned in the legislative history. Moreover, the majority's interpretation

letter and spirit of the Civil Rights Act of 1964", *Jefferson County,* 380 F.2d at 390. The decree provided in relevant part:

> Within their authority school officials are responsible for the protection of persons exercising rights under or otherwise affected by this decree. They shall, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference shall include harassment, intimidation, threats, hostile words or acts, and similar behavior.

*Id.* at 392.

40

of the statute based on legislative history would suggest that by using the unqualified words "discrimination under any education program" Congress only intended to cover the narrow areas of admissions, services, and employment. This contravenes both common sense and the plain meaning of the words of the statute.

Furthermore, the majority contends that Title IX may not be construed as authorizing a cause of action for a school board's failure to remedy student-on-student sexual harassment because such an interpretation would conflict with the notice of liability requirement of the Spending Clause, which is the constitutional provision under which Title IX was ostensibly enacted.[2] *See* Majority Op. at 3362, 3364-65 (citing *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539-40, 67 L.Ed.2d 694 (1981)). However, it is clear that the school board would have sufficient notice of liability based on the plain meaning of the statute, which unequivocally imposes liability on grant recipients for maintaining an educational environment in which students are subjected to discrimination. Further, sufficient notice was provided to satisfy the Spending Clause prerequisite for a damages action under Title IX as set forth in *Franklin,* 503 U.S. at 74-75, 112 S.Ct. at 1037-38. In *Franklin* the Court explained that the notice requirement for damages actions under the Spending Clause in Title IX cases is satisfied where the alleged violation was intentional. *Id.* The Court found that since sexual harassment constitutes intentional discrimination in violation of Title IX, the Spending Clause does not prohibit a cause of action for teacher-on-student sexual harassment under Title IX. *Id.* Similarly, in this case the alleged violation of Title IX was intentional because the school board knowingly permitted a student to be subjected to a hostile environment of sexual harassment. *See, e.g., Doe v. Petaluma City Sch. Dist.,* 949 F.Supp. 1415, 1422, 1427 (N.D.Cal.1996) (holding that hostile environment sexual harassment constitutes "intentional discrimination," and that schools are liable under Title IX when they know or should know about

---

[2]In *Franklin,* the Supreme Court assumed, without deciding, that Title IX was enacted pursuant to the Spending Clause. *Franklin,* 503 U.S. at 75 & n. 8, 112 S.Ct. at 1037 & n. 8. It is also arguable that the provision was enacted pursuant to § 5 of the Fourteenth Amendment. For purposes of this discussion, I will assume, like the majority, that the authorizing provision was the Spending Clause.

student-on-student sexual harassment and fail to take prompt remedial action); *Bruneau v. South Kortright Central Sch. Dist.,* 935 F.Supp. 162, 172 (N.D.N.Y.1996) (recognizing that a school's failure to take corrective action in response to hostile environment created by peers despite actual notice of harassment subjects it to liability for intentional discrimination, and therefore to damages under Title IX); *Burrow v. Postville Community Sch. Dist.,* 929 F.Supp. 1193, 1205 (N.D.Iowa 1996) (holding that intentional discrimination may be inferred from "the totality of relevant evidence, including evidence of the school's failure to prevent or stop the sexual harassment despite actual knowledge of the sexually harassing behavior of students over whom the school exercised some degree of control"); *Oona R.-S. v. Santa Rosa City Schs.,* 890 F.Supp. 1452, 1464, 1469 (N.D.Cal.1995) (explaining that discriminatory intent can be found in "the toleration of harassing behavior of male students, or the failure to take adequate steps to deter or punish peer harassment"); *see also Canutillo Independent School Dist. v. Leija,* 101 F.3d 393, 406 (5th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997) (noting that "when the Supreme Court referred to "intentional discrimination' in *Franklin,* it was referring to any form of discrimination other than disparate impact discrimination.").

Finding that Title IX authorizes a cause of action for student-on-student sexual harassment, we should then follow the lead of other courts, including the Supreme Court, in turning to Title VII principles to delineate the scope of the school board's duty and identify the elements of a cause of action under Title IX. In relevant part, Title VII requires an employer to take steps to assure that the working environment of its employees is free from sexual harassment[3] that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[3]Sexual harassment involves unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal or physical conduct of a sexual nature. 29 C.F.R. § 1604.11(a) (1991). Such harassment constitutes actionable sex discrimination in the workplace either as "quid pro quo" sexual harassment, which conditions employment benefits upon sexual favors, or as "hostile environment" sexual harassment, which creates an intimidating, hostile or offensive working environment that unreasonably interferes with an individual's work performance. *See Meritor* 477 U.S. at 62, 65, 106 S.Ct. at 2403, 2404-05.

environment." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (internal quotation marks and brackets omitted).

It is appropriate to turn to Title VII because the Supreme Court has explicitly relied on Title VII principles in explaining that sexual harassment constitutes intentional "discrimination" under Title IX:

> Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]' on the basis of sex." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 [106 S.Ct. 2399, 2402, 91 L.Ed.2d 49] (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.

*Franklin,* 503 U.S. at 74-75, 112 S.Ct. at 1037. Significantly, the Court relied on *Meritor,* a Title VII case, to resolve the issue.

A well established line of cases preceded the Supreme Court's decision to use Title VII principles in resolving a Title IX case. Prior to *Franklin,* courts had held that such principles are applicable in Title IX suits brought by employees of educational institutions. *See, e.g., Lipsett v. University of Puerto Rico,* 864 F.2d 881, 897 (1st Cir.1988) (Title IX's legislative history "strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII."); *see also Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 207 (4th Cir.1994); *Mabry v. State Bd. of Comm. Coll. & Occup. Educ.,* 813 F.2d 311, 316 n. 6 (10th Cir.1987), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). Courts had also relied on Title VII when evaluating Title IX sexual harassment claims by students. *See, e.g., Moire v. Temple Univ. Sch. of Medicine,* 613 F.Supp. 1360, 1366 & n. 2 (E.D.Pa.1985), *aff'd,* 800 F.2d 1136 (3d Cir.1986) (hostile environment sexual harassment); *Alexander v. Yale Univ.,* 459 F.Supp. 1, 4 (D.Conn.1977), *aff'd,* 631 F.2d 178 (2d Cir.1980) (*quid pro quo* sexual harassment).

Since the Supreme Court's *Franklin* case, at least five circuit courts have found that Title VII standards are applicable to students' Title IX sexual harassment claims. *See Oona, R.___S.___, by*

43

*Kate S. v. McCaffrey,* --- F.3d ---- (9th Cir.Aug. 13, 1997); *Doe v. Claiborne County,* 103 F.3d 495, 514 (6th Cir.1996); *Kinman v. Omaha Pub. Sch. Dist.,* 94 F.3d 463, 469 (8th Cir.1996); *see also Seamons v. Snow,* 84 F.3d 1226, 1232-33 & n. 7 (10th Cir.1996) (holding that although Title IX does protect against hostile environment sexual harassment in schools, plaintiff failed to state a valid claim because he did not allege that the harassment in question was based on sex); *Murray v. New York University College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995) ("The [*Franklin* ] Court's citation of *Meritor ...,* a Title VII case, in support of *Franklin* 's central holding indicates that, in a Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII."). *But cf. Rowinsky v. Bryan Indep. Sch. Dist.,* 80 F.3d 1006, 1016 (5th Cir.1996), *cert. denied,* ---U.S. ----, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996) (holding that student-on-student sexual harassment cannot be the basis for a cause of action under Title IX unless the plaintiff demonstrates that the school responded to sexual harassment claims differently based on sex.).

Additionally, the Ninth Circuit has recently relied on an analogy to Title VII in holding that the law is clearly established that school officials have a duty under Title IX to take reasonable steps to prevent student-on-student sexual harassment. *See Oona, R.___S.___,* pgs. *4-*6, --- F.3d at ----- ----. *See, e.g., Bruneau,* 935 F.Supp. at 172 ("When an employer fails to act to remedy a hostile environment created by co-workers the employer discriminates against an individual in violation of Title VII. Similarly, [this] Court finds that in the Title IX context, when an educational institution fails to take steps to remedy peer-on-peer sexual harassment, it should be held liable to the harassed student for that discriminatory conduct."); *Bosley v. Kearney R-1 Sch. Dist.,* 904 F.Supp. 1006, 1021 (W.D.Mo.1995) ("Following the [*Franklin* ] Court's logic, the same rule as when an employer is held liable for a sexually hostile work environment under Title VII must apply when a school district has knowledge of a sexually hostile school environment and takes no action."); *see also Nicole M. v. Martinez Unified School Dist.,* 964 F.Supp. 1369, 1377-78 (N.D.Cal.1997); *Collier v. William Penn Sch. Dist.,* 956 F.Supp. 1209, 1213-14 (E.D.Pa.1997); *Franks v. Kentucky School for*

44

*the Deaf,* 956 F.Supp. 741, 746 (E.D.Ky.1996); *Petaluma,* 949 F.Supp. at 1427; *Wright v. Mason City Community Sch. Dist.,* 940 F.Supp. 1412, 1419-20 (N.D.Iowa 1996); *Burrow,* 929 F.Supp. at 1205; *Oona R.___S.___,* 890 F.Supp. at 1467-69 & n. 13; *Patricia H. v. Berkeley Unified Sch. Dist.,* 830 F.Supp. 1288, 1293 (N.D.Cal.1993). *But see Garza v. Galena Park Indep.Sch. Dist.,* 914 F.Supp. 1437, 1438 (S.D.Tex.1994). Thus, the applicable case law firmly supports applying Title VII principles to delineate the scope of a school board's liability under Title IX for failure to remedy student-on-student sexual harassment.

Notwithstanding this abundant support for applying Title VII principles, the majority contends that Title VII principles may not be applied in this case because "the exposition of liability under Title VII depends upon agency principles." *See* Majority Op. at 3363 n. 13. The majority asserts that "[a]gency principles are useless in discussing liability for student-student harassment under Title IX, because students are not agents of the school board."[4] *Id.* This argument overlooks the Supreme Court's caveat in *Meritor* that "common law principles [of agency] may not be transferable in *all* their particulars to Title VII." *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408 (emphasis added).[5] Under *Meritor* 's flexible approach, courts have held that an employer may be held liable

---

[4]The majority also argues that Title VII case law is inapplicable to Title IX because Title IX, unlike Title VII, was enacted under the Spending Clause. However, the Supreme Court has relied on Title VII in analyzing claims under Title VI, which also was enacted under the spending power. In *Guardians Ass'n v. Civil Service Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), for example, the Court found that Title VI's prohibition of discrimination was "subject to the construction given the antidiscrimination proscription of Title VII in *Griggs v. Duke Power* Co. ...." *Guardians,* 463 U.S. at 592, 103 S.Ct. at 3227. The Court also adopted Title VII's "business necessity" defense to analyze disparate impact claims in a Title VI case involving student placement. *See Board of Educ. v. Harris,* 444 U.S. 130, 151, 100 S.Ct. 363, 375, 62 L.Ed.2d 275 (1979). Likewise, this court has utilized Title VII to analyze a disparate impact claim under Title VI, stating that "[t]he elements of a disparate impact claim may be gleaned by reference to cases decided under Title VII." *Georgia State Conf. of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1417 (11th Cir.1985). Thus, the fact that Title VII is not a Spending Clause statute has not been a bar to importing its standards into Title VI, which formed the template for Title IX, and therefore should not be a bar to importing its standards into Title IX.

[5]As Judge Tjoflat has explained, "Title VII, as interpreted in *Meritor,* requires employers to take steps to ensure that sexual harassment does not permeate the workplace. To the extent that the application of common law agency principles frustrates Title VII's goal of eliminating such harassment—by effectively relieving the employer of the responsibility of pursuing that

45

under Title VII for failing to take action to remedy a hostile environment created by non-employees, who are certainly not agents of the employer. *See, e.g., Powell v. Las Vegas Hilton Corp.,* 841 F.Supp. 1024, 1028 (D.Nev.1992) (denying motion to dismiss blackjack dealer's claim that her employer violated Title VII by failing to protect her from sexual harassment by gamblers at her table, because "an employer could be liable for the sexual harassment of employees by non-employees, including its customers"); *Magnuson v. Peak Technical Services, Inc.,* 808 F.Supp. 500, 512-13 (E.D.Va.1992) (holding that employers of alleged victim can be held liable for failing to take corrective action to remedy hostile environment created by non-employee); *see also Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982) ("The environment in which an employee works can be rendered offensive in an equal degree by the acts of supervisors, coworkers, or *even strangers to the workplace.*") (emphasis added) (internal citations omitted).[6] The employers were held liable in these cases by virtue of their own failure to comply with the duty of eliminating discrimination under Title VII—not under any theory of vicarious liability for the acts of a third party.

Application of Title VII principles also recognizes that a student should have the same protection in school that an employee has in the workplace.[7] *See Franklin,* 503 U.S. at 74-75, 112

---

goal—those principles must yield." *Faragher v. City of Boca Raton,* 111 F.3d 1530, 1544, 1546 n. 2 (11th Cir.1997) (Tjoflat, J., concurring in part, dissenting in part).

[6]Moreover, guidelines promulgated under Title VII recognize that an employer may be held liable for failing to take corrective action to remedy a hostile environment created by a third party. *See* 29 C.F.R. § 1604.11(e) ("An employer may also be responsible for the acts of non-employees in the workplace ..., where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.").

[7]Indeed, where there are distinctions between the school environment and the workplace, they "serve only to emphasize the need for zealous protection against sex discrimination in the schools." *Patricia H.,* 830 F.Supp. at 1292-93. The ability to control and influence behavior exists to an even greater extent in the classroom than in the workplace, as students look to their teachers for guidance as well as for protection. The damage caused by sexual harassment also is arguably greater in the classroom than in the workplace, because the harassment has a greater and longer lasting impact on its young victims, and institutionalizes sexual harassment as accepted behavior. Moreover, "[a] nondiscriminatory environment is essential to maximum intellectual growth and is therefore an integral part of the educational benefits that a student

S.Ct. at 1037-38. Just as a working woman should not be required to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living," *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (internal citation omitted), a female student should not be required to run a gauntlet of sexual abuse in return for the privilege of being allowed to obtain an education. In the employment context, women historically have not had the power to simply walk away from an environment that is made to be demeaning, embarrassing, and humiliating for them because of their gender. Similarly, it is virtually impossible for female students to leave their assigned schools to escape an environment where they are harassed and intimidated on the basis of their gender. Just as in the employment setting where employees are dependent on their employers to ensure workplace equality, so too students are dependent on teachers and school officials to control the educational environment. Additionally, sexual harassment—regardless of its source—subordinates girls in the classroom just as much as in the workforce. Although a hostile environment can be created by someone who supervises or otherwise has power over the victim, a hostile environment can also be created by co-workers or fellow students who have no direct power relationship whatsoever with the victim.[8] And like Title VII, Title IX was enacted to remedy that discrimination and ensure sexual equality in public education.

Having determined that Title VII principles should guide our analysis of the scope of the school board's liability under Title IX, I conclude that Davis's allegations sufficiently plead a cause

---

receives. A sexually abusive environment inhibits, if not prevents, the harassed student from developing her full intellectual potential and receiving the most from the academic program." *Id.* at 1293 (citation omitted).

[8]Numerous circuit courts, including this one, have held that an employer's failure to take prompt remedial action after notice of severe and pervasive sexual harassment by a co-worker is actionable. *See, e.g., Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir.1982); *see also DeAngelis v. El Paso Municipal Police Officers Assoc.,* 51 F.3d 591, 593 (5th Cir.1995); *Nichols v. Frank,* 42 F.3d 503, 508 (9th Cir.1994); *Carr v. Allison Gas Turbine Div. Gen. Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994); *Karibian v. Columbia University,* 14 F.3d 773, 779 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178, 182 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Baker v. Weyerhaeuser Co.,* 903 F.2d 1342, 1345-46 (10th Cir.1990); *Hall v. Gus Construction Co.,* 842 F.2d 1010, 1015-16 (8th Cir.1988).

of action.  The elements a plaintiff must prove to succeed in this type of sexual harassment case are: (1) that she is a member of a protected group;  (2) that she was subject to unwelcome sexual harassment;  (3) that the harassment was based on sex;  (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment;  and (5) that some basis for institutional liability has been established.  *See Meritor,* 477 U.S. at 66-73, 106 S.Ct. at 2405-09;  *see also Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 20-24, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993);  *Lipsett,* 864 F.2d at 898-902;  *Henson,* 682 F.2d at 903-05.

Assumed as true, the facts alleged in the complaint, together with all reasonable inferences therefrom, satisfy these elements.  There is no question that the allegations satisfy the first three requirements.  First, as a female, LaShonda is a member of a protected group.  Second, she was subject to unwelcome sexual harassment in the form of "verbal and physical conduct of a sexual nature."  29 C.F.R. § 1604.11(a).  Third, the harassment LaShonda faced clearly was on the basis of her sex.

As to the fourth requirement, I recognize that a hostile environment in an educational setting is not created by simple childish behavior or by an offensive utterance, comment, or vulgarity. Rather, Title IX is violated "[w]hen the [educational environment] is permeated with "discriminatory intimidation, ridicule, and insult' that is "sufficiently severe or pervasive to alter the conditions of the victim's [environment] and create an abusive environment,' " *Harris,* 114 S.Ct. at 370, 510 U.S. at 21 (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. at 2405-06) (internal citations omitted).  In determining whether a plaintiff has established that an environment is hostile or abusive, a court must be particularly concerned with (1) the frequency of the abusive conduct;  (2) the conduct's severity;  (3) whether it is physically threatening or humiliating rather than merely offensive;  and (4) whether it unreasonably interferes with the plaintiff's performance.  *Harris*, 444 U.S. at 142-44, 100 S.Ct. at 371.  The Court has explained that these factors must be viewed both objectively and subjectively.  If the conduct is not so severe or pervasive that a reasonable person would find it

48

hostile or abusive, it is beyond Title IX's purview. Similarly, if the plaintiff does not subjectively perceive the environment to be abusive, then the conduct has not actually altered the conditions of her learning environment, and there is no Title IX violation. *Id.*, 444 U.S. at 141-42, 100 S.Ct. at 370.

In this case, the five months of alleged harassment was sufficiently severe and pervasive to have altered the conditions of LaShonda's learning environment from both an objective and a subjective standpoint: (1) G.F. engaged in abusive conduct toward LaShonda on at least eight occasions; (2) the conduct was sufficiently severe to result in criminal charges against G.F. to which he pled guilty in state court; (3) the conduct, such as the groping and requests for sex, was physically threatening and humiliating rather than merely offensive; and (4) the conduct unreasonably interfered with LaShonda's academic performance, resulting in the substantial deterioration of her grades and emotional health. The facts alleged go far beyond simple horseplay, childish vulgarities, or adolescent flirting.

Finally, I believe that the fifth and final element—whether any basis for the Board's liability has been shown, has likewise been sufficiently alleged. Under Title VII, an employer may be held liable for a hostile environment of sexual harassment created by a co-worker if "the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Faragher,* 111 F.3d at 1538; *Henson,* 682 F.2d at 905; *see also Meritor,* 477 U.S. at 72-73, 106 S.Ct. at 2408-09. By analogy, in this instance the school board may be held liable if it knew or should have known of the harassment and failed to take timely remedial action. In Title VII cases, an employee can demonstrate that the employer knew of the harassment "by showing that she complained to higher management of the harassment or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Henson,* 682 F.2d at 905. (citation omitted). In this case, Davis has alleged that she told the principal—a higher level manager—of the harassment on several occasions. She also alleged that at least three separate teachers, in addition to the principal, had actual and repetitive knowledge from LaShonda,

49

her mother and other students.  Finally, Davis alleged that despite this knowledge, the school officials failed to take prompt remedial action to end the harassment.[9]  These allegations regarding institutional liability, as well as the other allegations, are sufficient to establish a prima facie claim under Title IX for sexual discrimination due to the Board's failure to take action to remedy a sexually hostile environment.

For all the foregoing reasons, I would reverse the district court's dismissal of Davis's Title IX claim against the Board.

---

[9]The complaint also alleged that during the time of the harassment, the Board had no policy prohibiting the sexual harassment of students in its schools, and had not provided any policies or training to its employees on how to respond to student-on-student sexual harassment.